UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

− − − − − − − − − − − − − − − − − − − − − − − − − − −X

TVT MUSIC, INC.                                              )
                                                             )
                                  Plaintiff,                 )
                                                             ) Civil Action No. 05 CV 5602
                   -against-                                 )
                                                             )
REP SALES, INC. d/b/a RYKO DISTRIBUTION                      )
PARTNERS and DM RECORDS, INC. d/b/a                          )
ICHIBAN RECORDS and/or CRITIQUE                              )
RECORDS,                                                     )
                                                             )
                                  Defendants.                )

− − − − − − − − − − − − − − − − − − − − − − − − − − −X

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

HALL, BOOTH, SMITH & SLOVER, PC.
611 Commerce Street, Suite 3000
Nashville, TN 37203
(615) 313-9913

*Attorneys for Defendants Rep Sales, Inc.*
*d/b/a RYKO Distribution Partners and DM*
*Records, Inc. d/b/a Ichiban Records and/or*
*Critique Records*

## <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................................1

Table of Authorities ........................................................................................................2,3

FACTUAL BACKGROUND ..............................................................................................4

ARGUMENT AND CITATION OF AUTHORITY ..........................................................14

STANDARD OF REVIEW ...............................................................................................14

A.  The TVT/Glover Agreement From Which Plaintiff Purportedly Derives Its
Rights to Sue Defendants in this, the Copyright Action, was V*oid Ab Initio* and, as such,
Plaintiff Cannot, as a Matter of Law, Maintain this Action Against Defendants for Lack
of Standing ...........................................................................................................14

B.  Glover Undisputedly Owned Rights in the Compositions at Issue and as an Owner,
Produced and Supervised the Remixes at Issue Pursuant to an Agreement with DM
and, as such, the Remixes at Issue Cannot, as a Matter of Law, be Infringing ...............17

C.  Glover Conveyed Half of His Ownership Rights in the Subject Compositions to DM and,
as such, Plaintiff Cannot, as a Matter of Law, Sustain This Action Against Defendants
Since DM is a Co-Owner, Assuming, *Arguendo,* That Plaintiff Has Any Ownership
Rights Which Defendants' Deny ...........................................................................18

D.  Plaintiff's Anticipated Arguments Regarding the Creation of Derivatives Are Moot for
the Above Reasons but Merely in Response Thereto, the Expert Analysis of the Remixes
Prepared by Lawrence Ferrara Does Not Establish That Derivatives of the Subject
Compositions Were Created Because There Was No Change to the Fundamental
Character of the Subject Works ...........................................................................20

1

## **TABLE OF AUTHORITIES**

### **CASES**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986)..................................................................................................14

Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986)..................................................................................................14

Davis v. Blige,
419 F. Supp. 2d  493, 500-501  (SD.N.Y. 2005) .............................................................20

EMI Latin v. Bautista,
No. 03 Civ. 0947 (WHP) , 2003 U.S. Dist. LEXIS 2612 at *10 (S.D.N.Y. February 23, 2004) .21

Galison v. Greenberg,
No. 04 Civ. 2629 (LLS), 2004 U.S. Dist. LEXIS 14915 at *2 (S.D.N.Y. August 2, 2004) .........20

Lava Trading, Inc. v. Hartford Fire Ins. Co.,
365 F. Supp. 2d 434, 440 (S.D.N.Y. 2005) ....................................................................14

Malaco Leaf AB v. Promotion in Motion, Inc.,
287 F. Supp. 2d 355, 378 (S.D.N.Y. 2003) ....................................................................14

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986).................................................................................................14

Sun Trading Dist. Co., Inc. v. Evidence Music, Inc.,
980 F. Supp. 722, 727 (S.D.N.Y. 1997) ....................................................................15, 16

Wayland Inv. Fund, LLC v. Millenium Seacarriers,
111 F. Supp. 2d 450, 453 (S.D.N.Y. 2000) ....................................................................19

Weissmann v. Freeman,
868 F. 2d 1313, 1318 (2d Cir. 1989) ..............................................................................20

### **STATUTES AND RULES**

Federal Rule of Civil Procedure 56 ................................................................................14

17 U.S.C. § 505 ...........................................................................16, 18, 20, 21, 22, 23

17 U.S.C. § 106 ................................................................................................................17

17 U.S.C. § 201 ..........................................................................................................................18

## I.        PREFACE AND FACTUAL BACKGROUND

As set forth and explained more fully below, two (2) actions are currently pending before this Court, **TeeVee Toons, Inc. d/b/a TVT Records v. Rep Sales, Inc. d/b/a Ryko Distribution Partners and DM Records, Inc., 03CV10148 (JGK)(KNF)** (the "Trademark Action") and **TVT Music v. Rep Sales, Inc. d/b/a Ryko Distribution Partners and DM Records, Inc. d/b/a Ichiban Records and/or Critique Records, 05CV5602 (JGK)(KNF)** (the "Copyright Action").  Defendants have, at the request of the Court, previously submitted the pleadings and orders filed with regard to Defendants' motion to consolidate the two (2) cases for the Court's consideration.  What follows is the memorandum of law in support of Defendants' Motion for Summary Judgment in the Copyright Action.  Because the parties and many of the documents, facts, compositions and sound recordings overlap, there may be repetition between the motions for summary judgment filed by Defendants in each action.  Defendants have endeavored to keep any repetition to a minimum but would respectfully direct the Court's attention to their motion and memorandum in the Trademark Action which, in many instances, also supports Defendants' arguments and assertions in the Copyright Action.

Plaintiff in the Copyright Action, is a wholly owned affiliate of TeeVee Toons, Inc. d/b/a TVT Records which was formed and is solely owned by Steven Gottlieb (collectively, "TVT").  (See, Deposition of Steven Gottlieb, pages 10-11, lines 11-25; 1-12).  Mr. Gottlieb and TVT have been involved in a substantial amount of litigation.[1]  Jacqueline Sussman, TVT's Vice President of Business and Legal Affairs for the last fourteen (14) years, recalled being deposed between ten and twenty times, five (5) depositions within the last three (3) years.  (See, Deposition of Vera Savcic,

---

[1] Mr. Gottlieb, who attended Harvard Law School but has never practiced law, has established a reputation in many industry circles for being litigious.  (See, Deposition of Steven Gottlieb, pages 16-17, lines 16-25; 1-10; Jeff Leeds, *Another Rap Feud: Def Jam Vs Tvt*, www.rapstation.com (05/08/2003) submitted as Exhibit B).

page 5, lines 20-22; Deposition of Jacqueline Sussman, page 6, lines 13-20).[2]  TVT has been recognized by the music industry trade publication, Billboard, as the number one  independent record company in the United States. (See, Deposition of Steven Gottlieb, page 37, lines 10-14).  Mr. Gottlieb presented a statement to Congress in April of 2001 wherein he stated, "From a one-man shop in 1985, TVT now employs well over 100 people and enjoyed sales in excess of 50 million dollars last year." (See, excerpt from *Online Entertainment and Copyright Law: Coming Soon to a Digital Device Near You: Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. J-107-9 (2001) submitted as Exhibit A).

Paul Burgess, Executive Vice President of TVT Records overseeing all marketing and promotion, sales and publicity, testified that TVT employs as many as 75-150 field marketing representatives that visit retailers and monitor co-op advertising programs.[3] (See, Deposition of Paul Burgess, page 47, lines 4-10).  Collectively, for the four (4) TVT albums at issue in the Trademark Action, TVT expended over two-million, eight-hundred thousand ($2,800,000.00) dollars.  (See, "TVT Coop Ads Line Item Report" submitted as Exhibit C).  Burgess further testified that the four (4) TVT albums collectively sold over four-million, six-hundred thousand (4,600,000) units. (See, Deposition of Paul Burgess, pages 33-37).  The pre-orders or pre-sales by retailers for the four (4) TVT albums collectively prior to their release exceeded seven-hundred, fifty-thousand units. (See,

---

[2] TVT has been the plaintiff in at least twelve (12) lawsuits (that Defendants were able to locate on-line including the current actions) within the last ten (10) years, one of the most notorious being TVT Records v. Island Def Jam Music Group, 279 F. Supp. 2d 413 and 288 F. Supp. 2d 506 (S.D.N.Y. 2003) wherein a jury awarded TVT $25 million in compensatory damages and $107 million in punitive damages, an amount the trial court remitted to a total of $54 million for contract, tort and copyright claims all of which was reversed on appeal by the 2nd Circuit leaving only $126,720.00 for a breach of contract claim that was not appealed. 412 F.3d 82 (June 14, 2005) *cert. denied* 126 S. Ct. 2968, 165 L. Ed. 2d 951, 2006 U.S. LEXIS 4929, 74 U.S.L.W. 3720 (U.S. 2006) (See, Deposition of Steven Gottlieb, pages 23-28).

[3] Mr. Burgess testified that "Co-op advertising is a joint advertising marketing campaign between record distributors and music retailers.  And the kinds of advertising and marketing commonly referred to as co-op include circular placement, such as the Best Buy or Target or Wal-Mart circulars, pricing and positioning in retail stores, display programs in retail stores, including an image from the album in local papers or in national magazines, joint campaign for TV ads where the album is promoted in the TV ad.  The same would be true for radio ads.  Could also be true for online advertising, such as banners or expandable banners. All those would generally fall under the area of co-op." (See, Deposition of Paul Burgess, pages 21-22, lines 19-25; 1-12).

Deposition of Paul Burgess, pages 38-40).  The independent promotion budgets[4] for the four (4) TVT albums collectively that Mr. Burgess could recall at his deposition were close to five-hundred thousand ($500,000.00) dollars. (See, Deposition of Paul Burgess, pages 48-51).

In stark contrast thereto, DM Records, Inc. ("DM") is a thirteen (13) year old small, family-owned record company in South Florida which employs only three (3) people in addition to the two (2) owners, brothers Mark and David Watson.  *Certified Crunk da Remix*, the album released by DM d/b/a Ichiban Records and Mirror Image Records which is the subject of this and the Trademark Action, had pre-orders or pre-sales to retailers of only sixty-thousand (60,000) units and sold a total of only approximately ninety-five thousand (95,000) units. (See, Affidavit of Joe Corcoran, ¶¶ 11-12 submitted as Exhibit T).  Total sales for the ten (10) albums at issue in the Copyright Action (excluding *Certified Crunk, da Remix*) **combined** were only approximately fifty-seven thousand, five-hundred (57,500) units.  DM expended less than seventy-five thousand ($75,000.00) dollars for co-op advertising on all the albums at issue collectively and only eight-thousand five-hundred ($8,500.00) dollars on independent promotion for *Certified Crunk da Remix*. (See, Affidavit of Mark Watson, ¶¶ 25 and 26, submitted as Exhibit S).  DM expended very little money on marketing and promotion in general which consisted primarily of only one consumer advertisement which aired on MTV2 for several weeks after the release of *Certified Crunk da Remix*. (See, Deposition of Mark Watson, page 315, lines 23-25; page 316, lines 1-6, page 317, lines 16-19; 30 second commercial, submitted as Exhibit FF).

The history leading to this unfortunate scenario of a small, independent record label being sued by the largest independent record company in the United States began in 1997 when Ichiban Records ("Ichiban") distributed the first album by the artist Lil Jon and the East Side Boyz entitled

---

[4] Mr. Burgess explained independent promotion in regard to radio airplay in his deposition as "Record labels oftentimes hire independent promoters who have relationships with radio programmers and radio station staff to promote their releases to that staff and to those programmers."

*Get Crunk, Who u wit, da Album*.  In fact, the first Lil Jon and the East Side Boyz single to chart in BillBoard was a single from that first album. (See, Billboard, Hot R&B Singles, April 18, 1998, Number 84, submitted as Exhibit Q).  In February, 1995, Carlos Glover ("Glover") d/b/a Mirror Image Records ("Mirror Image") entered into an exclusive distribution agreement with Ichiban for the exclusive distribution of all Mirror Image artists and records. (See, Record Distribution Agreement, submitted as Exhibit E).  Subsequently, in October of 1996, Mirror Image entered into an exclusive artist agreement with Black Market Entertainment ("B.M.E.") for the exclusive services of the artist Lil Jon and the East Side Boyz. (See, Exclusive Artist Recording Agreement, submitted as Exhibit F).[5]  It was pursuant to this agreement and the distribution agreement that *Get Crunk, Who u wit, da Album* was initially released by Ichiban.  In October of 2000, Glover/Mirror Image terminated the 1996 exclusive artist agreement with Lil Jon and released Lil Jon from his obligations thereunder with the very important exception that Glover/Mirror Image retained its ownership in the compositions and sound recordings at issue in these actions. (See, Termination and Release Agreement dated October 31, 2000, ¶¶ 3 and 4, submitted as Exhibit G).

In the late nineties (90's), Ichiban began experiencing financial difficulties and was forced to file for Chapter 11 bankruptcy which was subsequently converted to Chapter 7 and a bankruptcy trustee was appointed.  In an effort to build its catalog, and after due diligence, DM bid on the Ichiban assets which included the 1995 exclusive distribution agreement with Glover/Mirror Image and the first Lil Jon album, *Get Crunk, Who u wit, da Album*.  The assets also included an exclusive

---

[5] It was pursuant to this Agreement that Glover d/b/a Mirror Image obtained ownership and administration rights to the sound recordings and compositions embodied on Lil Jon's first album *Get Crunk, Who u wit, da Album* which were subsequently remixed by, and under the direct supervision of, Glover for the album at issue in the Trademark Action, *Certified Crunk da Remix* and all the albums at issue in the Copyright Action. (See generally, Affidavits of Mark Watson, David Watson and Joe Corcoran submitted as Exhibits S, R and T respectively).  For clarification, there are two (2) copyrights in every sound recording, a copyright in the sound recording itself which is registered with the Copyright Office using Form SR and a copyright in the underlying composition which is registered with the Copyright Office using Form PA.  **Importantly**, and what will be covered in more detail below, Glover, as the owner of all the compositions at issue in the Copyright Action had the full right and authority to create all the remixes at issue.  This fact alone precludes all of Plaintiff's claims in the Copyright Action.

distribution agreement between Ichiban and Collipark Records pursuant to which Ichiban had the exclusive right to distribute any and all Collipark Records, Albums and artists including the Ying Yang Twins. (See, Distribution Agreement between Ichiban Records and Collipark Records dated June 2, 1997 and Bankruptcy Motion and Order assuming and assigning executory contracts, submitted as Exhibit K and H respectively).[6]   Additionally, DM obtained an exclusive artist agreement between Ichiban and Michael Crooms p/k/a D.J. Smurf. (See, Exclusive Artist Recording Agreement between Ichiban and DJ Smurf dated January 13, 1998, submitted as Exhibit M).  It was pursuant to these agreements that DM acquired the rights to the songs "Stop Trippin'" and "One On One" by D.J. Smurf which are embodied on the *Certified Crunk da Remix* album which is the subject of this and the Trademark Action ("Stop Trippin'" is also one of the six (6) songs at issue in the Copyright Action).

Importantly, in July of 2001, DM entered into an exclusive distribution agreement with Glover/Mirror Image. (See, Record Distribution Agreement dated July 20, 2001, submitted as Exhibit I.  As explained more fully below, this particular agreement is critical because it precludes any assignment of the rights granted without first obtaining written consent of the other party thereto. (See, 2001 Record Distribution Agreement, ¶ 14, submitted as Exhibit I.  As set forth more fully below, the 2001 Record Distribution Agreement assigned to DM, among other things, the exclusive distribution, manufacturing, promotion and advertising rights for the songs identified in this Copyright Action. (See, Affidavit of Mark Watson, ¶ 4, submitted as Exhibit S; 2001 Record Distribution Agreement *generally*).  Glover/Mirror Image has never attempted to terminate the 2001 Record Distribution Agreement with DM. (See, Affidavit of Mark Watson, ¶ 8).  Under the terms of the exclusive Record Distribution Agreement, it was Glover's responsibility to pay all licensing fees,

---

[6] Collipark Records remains obligated to DM pursuant to the exclusive distribution agreement and, as such, Plaintiff, TVT, has no rights to distribute the Ying Yang Twins.  This issue is the subject of a separate arbitration action in Atlanta, Georgia.

royalties and obtain all necessary permissions. (See, 2001 Record Distribution Agreement, ¶¶ 4(b) and 5(f)). Pursuant to the 2001 Record Distribution Agreement and the Ichiban bankruptcy purchase, DM re-released the 1997 Lil Jon album, *Get Crunk, Who U Wit, da Album* in 2001. Neither Mr. Gottlieb, TVT nor any artist ever objected to said re-release.

In the summer of 2003, DM entered into an agreement with Glover/Mirror Image for the production of remixes of the songs on *Get Crunk, Who U Wit, da Album* as well as several other songs some of which were licensed by Glover/Mirror Image and two (2) of which DM brought to the project from the Ichiban assets ("Stop Trippin'" and "One On One"). (See, Deal Memo Correspondence dated August 15, 2003, submitted as Exhibit N).

The Deal Memo also provided that DM and Glover/Mirror Image each transferred to the other "…an undivided one-half (1/2) interest…" of each other's "…right, title and interest in all newly created master recordings made for this Album." (See, Deal Memo Correspondence dated August 15, 2003, ¶ 5, submitted as Exhibit N). It was clear from the title and language of the applicable paragraph in the Deal Memo, "Ownership of Newly Created Mixes," and communications between the parties, that the parties intended the assignment to be a complete fifty (50%) percent ownership transfer of the new songs. (See, Affidavit of Mark Watson, ¶¶ 14-18; Affidavit of David Watson, ¶9, submitted as Exhibit S).[7] As such, DM acquired ownership interest in the compositions that are the subject of the Copyright Action.

---

[7] Glover was subpoena'd to a deposition by Defendants on June 14, 2006 at which he appeared and refused to give testimony. On July 25, 2006 Magistrate Fox entered an Order commanding Glover to appear and testify. (See, Magistrate Fox's Order dated July 25, 2006, submitted as Exhibit V). When Glover appeared on August 18, 2006 pursuant to a second subpoena from Defendants he very obviously feigned amnesia and claimed to remember nothing. On October 16, 2006, Judge Thrash in the Northern District of Georgia, after hearing oral argument from counsel for Defendants and Glover, held that Glover, *pro se*, "…did not cooperate **or testify truthfully** at his deposition on August 18, 2006, defying and disregarding his obligations under the subpoena and Magistrate Judge Fox's Order that he appear and be deposed." [emphasis added] (See, Order of Judge Thomas Thrash, October 16, 2006, submitted as Exhibit W). Judge Thrash additionally sanctioned Glover and held him in contempt. Plaintiff's counsel took no part in the Motion for Sanctions and Contempt nor did Plaintiff's counsel subpoena Glover or attend the hearing before Judge Thrash in Atlanta. Finally, Glover appeared and gave testimony on October 24, 2006.

During the summer of 2003, DM made and paid for travel arrangements to facilitate Glover's attendance and participation in the remixes which are the subject of both actions. (See, Affidavit of Joe Corcoran, ¶ 4, submitted as Exhibit T; Affidavit of David Watson, ¶¶ 7-8).  Glover supervised and approved every stage of production for the remixes that are the subject of the Copyright and Trademark Actions and never objected to said remixes prior to the institution of these lawsuits. (See, Affidavit of Mark Watson, ¶¶ 6-9; Affidavit of David Watson, ¶ 5; Affidavit of Joe Corcoran, ¶ 3). Glover was provided, and he personally approved, all final CD masters to every song involved in these actions. (See, Affidavit of David Watson, ¶ 6; Affidavit of Joe Corcoran, ¶ 6; Affidavit of Mark Watson, ¶¶ 7-9).  All outside participants in the creation of the remixes at issue in this action were chosen and supervised by Glover. (See, Affidavit of Mark Watson, ¶ 13).  All pre-production and production work involved in the remixed songs involved in this Copyright Action were completed while Glover was in the DM studios in Florida. (See, Affidavit of Mark Watson, ¶ 19). Glover was not present for some of the final mixes and mastering sessions, but Mark Watson personally obtained his approval via telephone after Glover was provided the final masters of the final versions of the remixes at issue in this, the Copyright Action. (See, Affidavit of Mark Watson, ¶ 20).

Out of an abundance of caution, DM filed Notices of Intention to Obtain Compulsory Licenses with the Copyright Office, after a search of the Copyright Office records, to ensure that no unknown third parties who might assert rights were covered to avoid any possible infringement. (See, Compulsory License Certificates, submitted as Exhibit EE).  On November 4, 2003, DM released *Certified Crunk da Remix* which contained remixes created during the DM/Glover/Mirror

---

Only then did Glover ever express that he had not intended to assign any ownership rights to DM in the new mixes other than in the masters embodying the mixes despite the August 15, 2003 Deal Memo and his subsequent correspondence.  It is Defendants' contention that given Glover's history, his testimony is inherently untrustworthy, highly biased and should be disregarded.

Image sessions in Florida.  (See, Deposition of Mark Watson, page 251, lines 15-18).  This is a common time of the year in the industry to release albums because of the upcoming holiday season. In October of 2003, Mr. Gottlieb and TVT began making threatening telephone calls to DM's distributor and co-Defendant, Rep Sales as well as sending threatening letters to which Lori Landew[8] immediately responded. (See, Deposition of Lori Landew, page 52, lines 21-25, pages 53-58).  Ms. Landew called TVT's attorney who had sent the initial correspondence, William Liebowitz, to request information regarding TVT's concerns so she could investigate.  She testified that Mr. Liebowitz apologized for the letter and "Sounded somewhat embarrassed by the whole thing. Said this was, you know, he was acting at his client's request." (See, Deposition of Lori Landew, page 55, lines 12-25).  Ms. Landew also testified that Mr. Liebowitz "…wasn't able to give me a lot of information." (See, Deposition of Lori Landew, page 56, lines 2-5).

Nevertheless, Rep Sales and DM immediately responded and attempted to assuage Mr. Gottlieb's and TVT's stated concerns by taking action to notify all buyers regarding exactly what was embodied on _Certified Crunk da Remix_, and to even more clearly specify that the album contained remixes of old recordings and contained no new material. (See, E-mail exchange between DM and Rep Sales, bates-stamped RYKO 0533, submitted as Exhibit U; Deposition of Lori Landew, page 34, lines 21-25, page 35, lines 1-25, page 36, lines 1-5).  Additionally, Mark Watson contacted Mr. Gottlieb and asked Mr. Gottlieb what DM could do to resolve Mr. Gottlieb's concerns about the packaging of _Certified Crunk da Remix_ and even sent a copy of the packaging to him via Federal Express. (See, Deposition of Mark Watson, pages 301-305).  In spite of all the good faith efforts by

---

[8] Lori Landew is Rep Sales' Vice President of Business and Legal Affairs.

the Defendants to amicably resolve Mr. Gottlieb's and TVT's concerns, TVT filed suit against DM on December 22, 2003.[9]

A year and a half into the Trademark Action litigation, TVT filed suit against the Defendants a second time on June 15, 2005 (the "Copyright Action").  DM had released several more albums embodying the remixes co-produced and supervised by Glover pursuant to the August 15, 2003 Deal Memo between DM and Glover/Mirror Image ("2003 Deal Memo").  This time, there was no allegation of false advertising or unfair competition.  Instead, TVT had entered into an agreement with Glover sometime in April or May of 2005[10] whereby Glover purported to assign rights to TVT in certain compositions that were the subject of the 2003 Deal Memo with DM, the 2001 Record Distribution Agreement with DM and which Glover had remixed for *Certified Crunk Da Remix*! (See, Agreement dated "the ___ day of April, 2005," between TVT and Glover/Mirror Image ("TVT/Glover/Mirror Image Agreement"), submitted as Sealed Exhibit J).  Additionally, Glover also purportedly assigned rights in the master sound recordings which comprised the 1997 Lil Jon album *Get Crunk, Who U Wit, da Album* (including rights to manufacture, distribute, market, sell, promote and exploit the sound recordings) in clear violation of the 2001 Record Distribution Agreement with DM!

Evidently realizing that it had no publishing rights in the pre-existing Lil Jon and D.J. Smurf[11] compositions pursuant to its pre-existing agreements with Lil Jon,[12] TVT entered into the

---

[9] Amazingly, after both of these actions were filed against Rep Sales, Mr. Gottlieb called Ms. Landew and stated that he had heard Rep Sales might be sold and asked whether Ms. Landew wanted to have coffee and discuss going to work for Mr. Gottlieb! (See, Deposition of Lori Landew, page 141, lines 9-25, page 142, lines 1-7).

[10] The agreement between Glover/Mirror Image and TVT is dated "the ____ day of April, 2005" but contains a footer in the lower left hand corner of each page which reads, "Carlos Glover 05.27.05 final."

[11] D.J. Smurf's album "Dead Crunk" embodied the song entitled "Stop Trippin'" which featured a performance by Lil Jon and the East Side Boyz.

[12] Plaintiff has failed to produce a signed copy of the February 6, 2001 agreement cited in both Complaints as the agreement from which TVT derives its rights to sue Defendants in these actions.  Plaintiff has produced some

agreement with Glover/Mirror Image and immediately thereafter sued the Defendants a second time! The TVT/Glover Agreement is fatally flawed as discussed more fully below, and *void ab initio*, because Glover had already assigned the rights to DM that he purported to assign to TVT without the required approval of DM.  For this reason, alone the Copyright Action should be summarily dismissed.  When examined at his deposition concerning the 2001 exclusive Record Distribution Agreement between DM and Glover, Mr. Gottlieb testified as follows:

**Q**. "So, is it fair to say that you would have thought twice about entering into the agreement with Carlos Glover -- when I say 'you,' I mean TVT -- if you knew about the existence of this?" [referring to Plaintiff's Exhibit 3 - the 2001 exclusive Record Distribution Agreement between DM and Glover/Mirror Image which was the subject of the examination]

**A**. **"We wouldn't have come forward, no."** [emphasis added]

(See, Deposition of Steven Gottlieb, page 167, lines 13-25, page 168, lines 1-10).

In fact, however, the parties exchanged discovery documents in late March, 2005, a full month before the TVT/Glover Agreement was executed, and the 2001 exclusive Record Distribution Agreement between DM and Glover was the **very first document** produced by DM bearing bates-stamp numbers DM0001-DM0012!  Thus, in spite of having possession of, and easy access to, the 2001 Record Distribution Agreement, TVT still proceeded in bad faith to execute the TVT/Glover Agreement and rely on it to sue the Defendants a second time!

---

signed deal memos, inducement letters and an unsigned publishing agreement but has not been able to produce a signed copy of the February 6, 2001 long form document referenced in the Complaints.

## II.   ARGUMENT AND CITATION OF AUTHORITY

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants are entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  While Defendants must establish that no genuine issue of material fact exists, "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmovant "must come forth with more than a mere scintilla of evidence in support of their position" in order to overcome a properly supported motion for summary judgment.  Lava Trading, Inc. v. Hartford Fire Ins. Co., 365 F. Supp. 2d 434, 440 (S.D.N.Y. 2005) quoting Anderson v. Liberty at 252.

A.   **The TVT/Glover Agreement From Which Plaintiff Purportedly Derives Its Rights to Sue Defendants in this, the Copyright Action, was Void Ab Initio and, as such, Plaintiff Cannot, as a Matter of Law, Maintain this Action Against Defendants for Lack of Standing.**

To reiterate, even TVT's principal, Steven Gottlieb (an experienced, highly successful industry professional and Harvard Law School graduate who is not a stranger to litigation), admits that had TVT been aware of the 2001 exclusive Record Distribution Agreement between Glover/Mirror Image and DM ("2001 RDA"), TVT "wouldn't have come forward, no."  The reason is clear on the face of the contractual documents.  The Term of the 2001 RDA was for two (2) years,

"…or until Company [DM] has recouped any and all advances or payments made to Manufacturer [Glover/Mirror Image] or on Manufacturer's behalf or until Manufacturer reimburses Company for the said advances or payments.  Thereafter, this agreement shall automatically renew for terms of one year each, unless one party hereto shall give notice in writing to the other party within ninety (90) days prior to the end of the then current term of this Agreement that it does not intend to renew this Agreement." (See, 2001 RDA, ¶ 1).

DM has not recouped the advances and expenses paid to, and on behalf of Glover/Mirror Image, nor has either party to the 2001 RDA terminated the agreement.  As such, to date, the 2001 RDA is still in full force and effect.  As recognized by Mr. Gottlieb, the 2001 RDA conveyed to DM some or all of the same rights Glover/Mirror Image purportedly conveyed to TVT in 2005.  During his deposition, upon cross-examination, Mr. Gottlieb could not specifically recall any investigation done by TVT to confirm that Glover/Mirror Image had the rights supposedly being conveyed to TVT prior to Mr. Gottlieb signing the TVT/Glover/Mirror Image agreement.  The 2001 RDA conveyed to DM throughout the territory of the "World," the

a.    "…**sole and exclusive** right to advertise, promote and sell the Recordings/Records through Normal Retail and Distribution Channels…
    b.    "…right to use the [sic] publish and to permit others to use and publish the names, professional names, likenesses, photographs and biographical material of all persons whose performances are embodied in the Manufacturer's Recordings in connection with the sale, exploitation and marketing of same…
    c.    "…right to publicly perform or to permit the public performance of the Manufacturer's Recordings by any means whatsoever whether new of hereafter known." (See, 2001 RDA, ¶ 2 a-b).

The 2005 TVT/Glover/Mirror Image Agreement purported to convey these same rights to TVT in direct violation of DM's rights above.  Further, the 2001 RDA provides that Glover/Mirror Image could not "withdraw" a specific recording from DM's exclusive distribution for distribution elsewhere without first obtaining written consent from DM, which written consent was never sought or obtained by Glover/Mirror Image. (See, 2001 RDA, ¶ 3).  As concerns, TVT's copyright

infringement claims against Defendants, it was the exclusive obligation of Glover/Mirror Image to obtain all necessary permissions, mechanical licenses and to pay all applicable fees, including mechanical license fees, if any were required. (See, 2001 RDA, ¶¶ 4 and 5(f)).

Since Glover/Mirror Image conveyed to DM the exclusive rights to sell, distribute and promote product as well as license distribution rights to other territories, etc., Glover/Mirror Image could not thereafter convey to TVT "…the sole , exclusive and unrestricted right in perpetuity to administer and exploit the Selections by any and all means throughout the Territory…" without potentially negatively impacting the exclusive rights granted to DM in the 2001 RDA.  Obviously, that is exactly what happened because DM is now being sued for exercising its exclusive rights under the 2001 RDA essentially ruining the 2001 RDA assignment.  This scenario exemplifies the purpose of Paragraph 14 of the 2001 RDA which precludes any assignment of some or all of a party's rights without written consent of the other party.  It clearly would not have been unreasonable for DM to withhold written consent under the present circumstances had Glover/Mirror Image requested DM's consent for purposes of assigning exclusive rights to a third party who was currently suing DM!  Thus, the purported agreement between TVT and Glover/Mirror Image is *void ab initio* as clearly in contravention of the 2001 RDA.  As such, this Copyright Action should be summarily dismissed with prejudice  as TVT lacks sufficient standing and attorneys fees should be awarded to Defendants pursuant to 17 U.S.C. § 505.

**B.    Glover Indisputably Owned Rights in the Compositions at Issue and as an Owner, Produced and Supervised the Remixes at Issue Pursuant to an Agreement with DM and, as such, the Remixes at Issue Cannot, as a Matter of Law, be Infringing.**

It is a very basic tenet of Copyright Law that the undisputed owner of a copyright interest in a composition has many exclusive rights with regard to that composition.  17 U.S.C. § 106 sets forth the exclusive rights of the copyright holder and provides,

> "Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>> (1) to reproduce the copyrighted work in copies or phonorecords;
>> (2) to prepare derivative works based upon the copyrighted work;
>> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

It is clearly undisputed in this case that Glover/Mirror Image owned or controlled a copyright interest in the compositions which are the subject of this Copyright Action.  TVT's standing to bring this action allegedly stems from the 2005 TVT/Glover/Mirror Image Agreement discussed above.  As such, TVT cannot dispute that Glover/Mirror Image had such a copyright interest.  Additionally, Glover/Mirror Image's copyright interest therein is well documented as outlined above in the Preface and Factual Background.  As the holder of that interest, Glover participated in the creation of the remixes that are at issue in this Copyright Action.  Pursuant to Section 106 of the Copyright Act, therefore, the remixes at issue in this case cannot, as a matter of law, be infringing since they were created, in whole or in part, by an undisputed holder of a copyright interest in the subject

compositions.  For that reason alone, this Copyright Action should be summarily dismissed with prejudice and attorneys fees awarded to Defendants pursuant to 17 U.S.C. § 505.

**C.    Glover Conveyed Half of His Ownership Rights in the Subject Compositions to DM and, as such, Plaintiff Cannot, as a Matter of Law, Sustain This Action Against Defendants Since DM is a Co-Owner, Assuming, *Arguendo,* That Plaintiff Has Any Ownership Rights, Which Defendants' Deny.**

Section 201(a) of the Copyright Act states that joint authors of a work become co-owners of the copyright, and each owner must share his indivisible and nonexclusive right in the creation with other authors.  (See, M. Nimmer and D. Nimmer, 2 *Nimmer on Copyright* § 6.01-6.02 (2006)).  In joint works, a co-owner of the copyright may always transfer interest to a third party with the exception of an express agreement to the contrary or granting an exclusive license. (See, *Nimmer* at § 6.11).

In the present action, Glover/Mirror Image, as a Participant in the August 15, 2003, Co-Production Deal Memo assigned and transferred to DM an undivided one-half (1/2) interest in the remixes at issue in this Copyright Action.  (See, August 15, 2003 Deal Memo, ¶ 5, submitted as Exhibit N).  The Deal Memo contained the "…basic terms for a Co-Production Agreement…to be entered into between DM Records, Inc.…and Carlos Glover d/b/a Mirror Image Records…for the new re-mixes of the above-referenced Masters." (See, August 15, 2003 Deal Memo, Introductory Paragraph, submitted as Exhibit N).  Pursuant to the Deal Memo, Glover/Mirror Image granted copyright ownership interest in and to the remixes that are the subject of this Copyright Action.  The Deal Memo sets forth that if the proposal met with Glover/Mirror Image's approval, Glover was to sign the Deal Memo and DM would prepare a long-form Agreement which incorporated the provisions of the Deal Memo. (See, August 15, 2003 Deal Memo, Concluding Paragraph, submitted as Exhibit N).  Glover signed the Deal Memo and DM prepared the long-form Agreement which

incorporated the provisions of the total fifty-fifty (50-50) co-ownership agreement discussed by the parties and to which the parties had agreed.  (See, Exclusive Manufacturing, Marketing and Distribution Agreement dated August 15, 2003, submitted as Exhibit DD).  While the long form was never signed by Glover, it is clear from the Deal Memo, actions and correspondence between the parties that a true fifty-fifty (50-50) co-ownership agreement was contemplated and consummated whereby the parties shared equal ownership in everything including equal copyright ownership of the masters and underlying remixes/compositions embodied thereon.  (See, Affidavit of Mark Watson, ¶¶ 16-18 and attached e-mail correspondence, submitted as Exhibit S).  To the extent TVT may allege that the Deal Memo does not transfer any portion of the rights above, any ambiguity in that regard, which Defendants deny exists, can be resolved by reference to parol evidence such as the e-mail correspondence from Glover/Mirror Image to DM dated October 15, 2003.[13]  In the October 15, 2003 Glover/Mirror Image e-mail correspondence, Glover seeks to negotiate certain terms of the long-form Agreement (although, notably, he mentions nothing about negotiating the co-ownership provisions in the masters and compositions) and concludes by stating, "I suggest we pursue this project on the basis of our original understanding whereas **we share everything including the exclusive rights on a 50/50 basis** [emphasis added]."  As such, DM has an ownership interest in the compositions which are the subject of this Copyright Action.  Assuming, *arguendo*, that TVT has

---

[13] The Glover/Mirror Image e-mail correspondence is bates-stamped DM0189 and attached to the Affidavit of Mark Watson.  When an ambiguity is present in a contract, the parol evidence rule allows courts to go beyond the written terms of a contract and consider extraneous evidence. Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 453 (S.D.N.Y. 2000).  In Wayland,  the Southern District  of New York asserts "the parol evidence rule bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous. If the terms are ambiguous or contradictory, however, the rule permits the consideration of such evidence not to alter the terms but solely to ascertain the true meaning of the terms." Id. (citing W.W.W. Assoc., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990)).  A term is ambiguous when it suggests more than one meaning to a reasonable person, familiar with the trade or business at issue, looking at the contract objectively.  Id. at 455 (citing Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998)).  The parol evidence rule allows the court to circumvent ambiguity by looking to evidence beyond the contract at issue.

any ownership rights at all in said compositions, which Defendants deny, TVT cannot assert those rights against Defendants since DM would be considered a co-owner of the rights.

In Weissmann v. Freeman, the 2nd Circuit Court of Appeals held "an action for infringement between joint owners will not lie because an individual cannot infringe his own copyright." 868 F. 2d 1313, 1318 (2d Cir. 1989).  The Southern District of New York confirmed this holding in Davis v. Blige.  419 F. Supp. 2d  493  (SD.N.Y. 2005).  The Court in Davis granted summary judgment to defendant, a co-owner of a copyright with plaintiff,  after finding the defendant lawfully transferred a license to a third party.  Id. at 501.  The Court asserts that this is permissible, and that the plaintiff had no claim because a joint owner **cannot sue** another for copyright infringement.  Id. at 500.  As shown by settled case law, Copyright Law explicitly bars any lawsuit for infringement between owners.  Galison v. Greenberg, No. 04 Civ. 2629 (LLS), 2004 U.S. Dist. LEXIS 14915 at *2 (S.D.N.Y. August 2, 2004).  As such, this Copyright Action should be summarily dismissed with prejudice and attorneys fees awarded to Defendants pursuant to 17 U.S.C. § 505.

**D.   Plaintiff's Anticipated Arguments Regarding the Creation of Derivatives Are Moot for the Above Reasons but Merely in Response Thereto, the Expert Analysis of the Remixes Prepared by Lawrence Ferrara Does Not Establish That Derivatives of the Subject Compositions Were Created Because There Was No Change to the Fundamental Character of the Subject Works.**

Defendants anticipate that Plaintiff will argue that DM had no ownership interest in the compositions at issue in this Copyright Action and will urge this Court that Defendants are liable for copyright infringement on the grounds that the remixes created/produced by Glover/Mirror Image/DM and subsequently released by DM were derivatives as opposed to remixes.  Defendants urge this Court that Plaintiff's argument in this regard should not even be reached and analyzed based upon the above.  However, because Plaintiff insisted on having an expert analyze the remixes at issue, Defendants were forced to retain an expert to review the findings of Plaintiff's expert,

Lawrence Ferrara.  (See, Expert Report of Elizabeth Marlowe and attached CV, submitted as Exhibit GG).  Ms. Marlowe is an entertainment attorney with copyright law experience as well as a professional and published songwriter.  While Ms. Marlowe took little exception with Dr. Ferrara's technical analysis of the contents of the remixes at issue, she disagreed entirely with Dr. Ferrara's opinions given during deposition that the resulting tracks were derivatives as opposed to remixes.[14]

As set forth above, and more fully in the expert report of Elizabeth Marlowe, out of an abundance of caution, DM complied with the provisions of 17 U.S.C. §115(b)(1) in obtaining compulsory licenses for the releases at issue in this action to avoid any potential infringement claims by unknown third parties after a search of the Copyright Office records.  Upon discovery of the copyright claims registered by TVT with the Copyright Office in 2005 following the TVT/Glover/Mirror Image Agreement,[15] and because of the already pending litigation, DM immediately continued complying with the compulsory license provisions of Section 115 by accounting and paying royalties to TVT as required by the statute.  Ironically, in spite of all of DM's continued good faith efforts to comply with Copyright Law, TVT sued Defendants anyway.

---

[14]   A remix has been previously defined as "a track that uses an existing recording of vocals from a previously recorded track, but removes the music and adds new music to create a different track." EMI Latin v. Bautista, No. 03 Civ. 0947 (WHP) , 2003 U.S. Dist. LEXIS 2612 at *10 (S.D.N.Y. February 23, 2004).  It also involves lyrical alterations to a more limited extent. Remixing originated in the 1960s and 1970s with Jamaican "dub" raggae producers.  Ben Williams, *The Remixmasters: A History Lesson for Puffy Combs,* Slate Magazine, *available at* http://www.slate.com/id/2068368 (July 29, 2002) [hereinafter Williams, *The Remixmasters*].  In the late 1960s, Jamaican disc jockeys and producers composed instrumental versions of popular ska hits.  Id.  These "dubs" (short for doubles) of ska records attracted large crowds who sought to hear different versions of popular songs. Id. The art of remixing spread to the United States in the 1970s through Caribbean immigrant populations when early hip hop producers brought the practice to America's urban audiences.  John Von Seggern, *Remix History*, Postdigital Remix Culture and Online Performance Exhibit, *available at* http://ethnomus.ucr.edu/remix_culture/remix_history.htm (last viewed November 27, 2006) [hereinafter Von Seggern, *Remix History*].  Remixing has since expanded to compose a large portion of released hits from dance, reggae, and most importantly, hip-hop and rap music.  Williams, *The Remixmasters*.  Remixing has become a prevalently used art-form in hip-hop and urban music to the extent that a Grammy award category has been created for it.  Michael Crooms testified at his deposition that not only is remixing a common practice in urban music but also that it is common for remixes to be created without the original artist's participation. (See, Deposition of Michael Crooms, page 86, lines 7-25, page 87, lines 1-11).

[15]   TVT never contacted DM regarding its copyright registrations underlying this lawsuit. DM discovered them while conducting routine searches of the Copyright Office records.

Section 115(a)(2) provides in pertinent that,

"A compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved, but the arrangement shall not change the basic melody or fundamental character of the work, and shall not be subject to protection as a derivative work under this title, except with the express consent of the copyright owner."

As supported by the testimony of Ms. Marlowe, the remixes as analyzed by Dr. Ferrara did not, in fact, change the fundamental character of the works at issue sufficiently enough to depart the realm of "remix" (as that art-form exists and existed when the remixes were created) and enter the realm of "derivative."  It became abundantly clear during the deposition of Dr. Ferrara that the remix art-form could never exist under his stringent and overly restrictive interpretation of a derivative work.  Famous "covers" of pop standards such as John Coltrane's recording of "My favorite Things" would be punishable as copyright infringement under Dr. Ferrara's analysis and deposition testimony.  As such, it was clear that either Dr. Ferrara did not have an accurate understanding of what Section 115(a)(2) allows a person to do with a compulsory license or he was willing to take any position to support TVT's allegations.

Quite simply, this analysis never needs to be reached or addressed by the Court for the reasons set forth in Sections A, B and C above.  As such, this Copyright Action should be summarily dismissed with prejudice and attorneys fees awarded to Defendants pursuant to 17 U.S.C. § 505.

### III.    CONCLUSION

As set forth and supported above, TVT lacks standing to bring this Copyright Action as a matter of law because the TVT/Glover/Mirror Image Agreement from which it purportedly derives it rights is *void ab initio*.  Alternatively, the remixes at issue were indisputably created, in whole or in

part, by an owner of a copyright interest therein and, therefore, the remixes cannot, as a matter of

law, be infringing.  Alternatively, the undisputed holder of a copyright interest in the subject remixes

transferred copyright ownership therein to DM and, as a matter of law, Defendants cannot be liable

for copyright infringement.  Finally, although this argument by Plaintiff should never be reached,

DM, out of an abundance of caution, obtained compulsory licenses for the compositions at issue and

pursuant thereto, released remixes permitted by 17 U.S.C. § 115(a)(2) and not derivatives.  As such,

Defendants respectfully submit that this Copyright Action should be summarily dismissed with

prejudice and attorneys fees awarded to Defendants pursuant to 17 U.S.C. § 505.

Respectfully submitted this 30th day of November, 2006.

**HALL, BOOTH, SMITH & SLOVER, PC.**

By: /s/ Karl M. Braun_____
Karl M. Braun, *pro hac vice* 6/8/04
611 Commerce Street
The Tower, Suite 3000
Nashville, TN 37203

**PROSKAUER ROSE LLP**
Jenifer de Wolfe Paine (Bar No.: JP 9393)
1585 Broadway
New York, New York 10036-8299

*Attorneys for Defendants Rep Sales, Inc. d/b/a*
*RYKO Distribution Partners and DM Records, Inc.*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on November 30, 2006, I caused to be served a copy of **Defendants' Memorandum in Support of Motion for Summary Judgment** on counsel for Plaintiff, by electronic notification and facsimile, as follows:

Brian D. Caplan, Esq.
Michele C. Cerullo, Esq.

LABATON SUCHAROW & RUDOFF
100 Park Avenue
New York, New York 10017
Fax:     212.818.0477

By: /s/ Karl M. Braun_____
Karl M. Braun, *pro hac vice* 6/8/04