```
 1                      S. Gottlieb
 2         Q.     What was the name of the science
 3   TV show?
 4         A.     Omni.
 5         Q.     And did that -- what network did
 6   that air on?
 7         A.     I don't recall.
 8         Q.     How long were you there?
 9         A.     I don't recall exactly.
10         Q.     You don't recall how long you
11   were with that production company?
12         A.     Less than a year.
13         Q.     And then what did you do after
14   that?
15         A.     I went to law school.
16         Q.     Where did you go to law school?
17         A.     To Harvard Law.
18         Q.     When did you graduate from
19   Harvard?
20         A.     I'm really bad with dates, annual
21   dates.  It was -- I believe it was '84.
22         Q.     Did you take any bar examinations
23   when you graduated?
24         A.     I did not complete the bar.
25         Q.     Did you start to take the bar?
```

31

```
 1                    S. Gottlieb
 2      Q.    Did you feel it had an adverse
 3  impact on the state of digital quality?
 4      A.    No.
 5      Q.    Any other lawsuits that you
 6  remember?
 7      A.    Not off the top of my head, no.
 8      Q.    Do you remember giving a
 9  deposition two months ago in the Slip N Slide
10  records case?
11      A.    I don't recall the deposition but
12  there was a dispute.  There was a dispute with
13  Slip N Slide.
14      Q.    Slip N Slide Records has accused
15  TVT for tortious interference in this case; is
16  that right?
17      A.    Yes.
18      Q.    And that relates to what they
19  have alleged as an attempt by TVT to block a
20  Slip N Slide release by Pitbull called Welcome
21  to the 305; is that right?  That is their
22  allegation?
23      A.    No.
24      Q.    What is their allegation?
25      A.    It's in the public record.  I
```

S. Gottlieb

      MR. CAPLAN: No. I'm objecting to the question. No, I'm not objecting to my client's question. He asked a question separate and apart from my objection.

    Q.   Well, that is what I'm asking you. Carlos Glover make a representation to you whether or not this agreement was still in force?

    A.   That he had all the rights to the agreement.

    Q.   And he didn't mention the July 20, 2001 distribution agreement between he doing business as Mirror Image and DM Records; is that right?

    A.   It seems to say that it's a two-year agreement. This is the first time I'm looking at it.

    Q.   Do you see the automatic renewal since you saw the two years, do you see the automatic renewal?

    A.   You've had our paperwork for some time. If we've done something wrong --

      MR. CAPLAN: Just answer the

1            S. Gottlieb

2       question.

3       A.    I know nothing about it.

4       Q.    So, is it fair to say that you

5  would have thought twice about entering into

6  the agreement with Carlos Glover -- when I say

7  "you," I mean TVT -- if you knew about the

8  existence of this?

9       A.    We wouldn't have come forward,

10 no.

11      Q.    Earlier we discussed the

12 definition of derivatives and remixes.  Not

13 every remixed composition is necessarily a

14 derivative, is it or do you have any

15 knowledge?

16           MR. CAPLAN:  Object to the form

17      of the question.  Calls for a legal

18      conclusion.

19           You can give your understanding.

20      A.    Well, my understanding -- you

21 know I think this is a matter for the lawyer,

22 but my informed belief is most remixes are

23 done under the direction of the artist with

24 the involvement of the artist, and as part of

25 the artist involvement.

1           S. Gottlieb
2    to enter into those deals, then I had every
3    reason to believe that they were free from any
4    other entanglements.
5         Q.   Did you inquire as to whether or
6    not they were actually free to enter in the
7    those agreements or did you just assume they
8    were because they had been?
9         MR. CAPLAN:   Objection as to
10        form.
11        You can answer.
12        A.   No.  As part of every agreement,
13   there are standard reps and warranties.  As I
14   said, the fact that they were well-known,
15   successful and no one had contested Koch's
16   rights to exploit their highly successful
17   record, there was open bidding on them to
18   secure their rights when they finished their
19   deal with Koch.
20             It was a matter of general
21   knowledge.  If no one stood up to enforce
22   their rights in any way.  I can't imagine they
23   were serious about protecting the rights.
24        Q.   You have been involved -- TVT has
25   been involved in acquiring assets out of

231

S. Gottlieb

1
2  Q.  Again, you said released by DJ
3  Smurf and Sammy Sam, you didn't mean released
4  by?
5  A.  Under their name.
6  Q.  Under their name, okay.
7     You didn't object to the DM 2001
8  re-release by DM of the Get Crunk Who U Wit
9  album, correct?
10     MR. CAPLAN:  Objection as to
11  form.  Lack of foundation.
12  A.  Did it cause confusion in the
13  marketplace.  It didn't -- wasn't mismarketed.
14  Didn't involve substantial misrepresentation.
15  If Carlos Glover had rights to remix his
16  record, that is all it was, then fine.
17  Q.  How much confusion in the
18  marketplace do you think Certified Crunk da
19  Remix cost?
20  A.  Enough for us to get a bunch of
21  calls and you know.  In my mind probably
22  siphon off a million dollars worth of sales
23  from that would have naturally gone to Lil'
24  Jon's records that accidentally went to these
25  records.