Case 1:05-cv-05602-JGK-KNF   Document 62-12   Filed 01/16/07   Page 1 of 10

Page 330

Watson

to cover all bases.

Q. These filings for notice of intentions to obtain compulsory licenses, these were for the remixes that we've been going over on Exhibit 11?

A. This actually was used for those, yes, Exhibit 11.

Q. What led you to believe that the compositions, as they appear on Exhibit 11, were subject to compulsory licenses?

MR. BRAUN: Object to the form.

Q. Do you understand the question?

A. Yes, I understand the question, and the answer is I don't know if they were subject or not. We were basing this off of a pure sense of caution with respect to the compositions.

I have a licensing book, and it's a very thick book, and this is not done much, I don't think so, probably less than a hundred times a year. I mean, it's the Library of Congress, but it's basically to ensure that you are not an infringer. Obviously, that didn't work. We were sued for infringement.

Q. Have you engaged a musicologist in

Watson

TVT with a notice of intention to obtain compulsory license for making and distributing phonorecords. I believe this was sent when TVT refused to sign a negotiated mechanical license to their newly acquired interest in the compositions.

Q. When did DM Records discover that TVT Music, Inc. had an interest in a number of the underlying compositions at issue in this proceeding?

A. We briefly, in the course of our work with the songs in this lawsuit, we would search the Copyright Office records on a -- online every month or so just -- just to be updated as to any type of changes.

To our surprise, and it was a shock and a surprise, as was a recent shock that TVT acquired some type of interest in the compositions that were in a lawsuit that they were involved with earlier with us. You know, the trademark case, I should say. It was confusing and shocking.

MR. CAPLAN: I move to strike that portion of the answer that was not

Watson

responsive to the question.

Can you read back the question to him, please?

MR. BRAUN: I object to that motion.

(Record read.)

MR. BRAUN: Object to the form of the question.

A. Could I look at the exhibits again?

Q. Sure.

A. As stated in my previous question --

MR. BRAUN: Answer.

A. -- or, answer, we searched the copyright records every few weeks or monthly or whatever to see if there was -- if there were any filings for registrations for the compositions pertaining to the "Certified Crunk, Da Remix." So we found out, to answer your question, Mr. Caplan, I would imagine it was prior to June 21st of 2005.

Q. Would it be sometime in 2005?

A. It would be in 2005, yes.

Q. And was it pursuant to a search of the Copyright Office's Website?

A. Their Website, yes. We were never

Watson

sent any documents from TVT saying that they purchased any rights.

 Q. And who conducted that search?

 A. I did.

 Q. Did you print it out when you conducted it?

 A. I don't recall. I don't have a printer in my office.

 Q. Do you have any documents that would indicate the day that you discovered that TVT held an interest in a number of the underlying compositions involved in this case?

 MR. BRAUN: Object to the form.

 A. I don't have a specific date when they had a purported interest in these compositions.

 Q. Has TVT granted any licenses in connection to the interests that they have to DM?

 MR. BRAUN: Object to the form.

 A. No, which is very rare in this industry.

 Q. Did you get the SR recording, or no?

 MR. BRAUN: I think so. I would like to talk to my client --

Watson

MR. CAPLAN: Do you want to take a two-minute break?

MR. BRAUN: -- to verify that it's --

MR. CAPLAN: Yes. Can we take a two-minute break?

THE VIDEOGRAPHER: The time is 12:01. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 12:10 and we're back on the record, video number -- sorry. We're back on the record.

MR. CAPLAN: Let's have marked as Plaintiff's Exhibit 47 a two-page document from the Copyright Office that was just provided to counsel, so it has no Bates stamp numbers, and it is -- appears to be dated October 24, 2003.

(Plaintiff's Exhibit 47, a two-page document from the Copyright Office dated October 24, 2003, marked for identification, as of this date.)

Q. I show you what has been marked as Plaintiff's Exhibit No. 47 and ask you if you can identify that document for the record.

1       Watson
2       A.      This looks like a copy of the SR form
3  for the album "Certified Crunk, Da Remix."
4       Q.      And this is what came back from the
5  Copyright Office, the registration?
6       A.      This is a copy of what came back, yes.
7       Q.      Who filled out this form?
8       A.      I believe Joe typed it up.
9       Q.      And who gave Joe the information to
10 include in this form?
11      A.      I think I gave him the information or
12 he picked up the information from the CD.
13      Q.      If you turn to the second page of this
14 form?
15      A.      Yes.
16      Q.      And you look at paragraph A on that
17 page?
18      A.      Yes.
19      Q.      It says, "Derivative works of the
20 original sound recordings," and then lists a
21 bunch of titles, you see that?
22      A.      Yes.
23      Q.      And what was meant by that?
24              MR. BRAUN:  Object to the form.
25      A.      What was meant to filling that out?

Watson

Q. Yes.

A. I believe to describe what took place.

Q. What did the words "derivative works" mean in the context used in that sentence?

MR. BRAUN: Object to the form.

A. They were new sounds combined with original sounds. This is with respect to the sound recording.

Q. And looking at paragraph B below, it says, "New productions and additional sounds from original vocal sound sources." Do you see that?

A. Yes.

Q. Were there any additional lyrics added to any of the subject songs?

MR. BRAUN: Object to the form.

A. No. I believe there were some lyrics taken out.

Q. And it's your position that there were no lyrics added?

MR. BRAUN: Object to the form.

A. There were no -- no, there were no lyrics added.

MR. CAPLAN: Let's mark as Exhibit 48

Watson

Mix," is that what you're asking?

Q. I'm asking for any of the subsequent releases of some of those songs as they appear on Exhibits 30 to 39.

MR. BRAUN: Object to the form.

Q. Do you understand the question?

A. I would have to go through each CD and see. I can't -- you can't just show me a stack of exhibits like that.

Q. I'll go through each one individually.

A. Okay.

Q. But the question is were there different -- were there subsequent new mixes created for any of the songs that appear or any of the tracks that appear on Exhibit 11?

MR. BRAUN: Object to the form.

Q. After the release of "Certified Crunk, Da Remix"?

A. Yes.

Q. Okay. And do some of those remixes appear on some of the CDs that we've marked 30 to 39?

MR. BRAUN: Object to the form.

A. I'm looking to see if the "Reggaeton

Page 344

Watson

Remix" is in that stack.

        (Mr. Caplan indicating CD.)

   A.   Oh, yes. Yes, there were.

   Q.   Is "Reggaeton Remix" the only CD of the CDs between 30 and 39, or Plaintiff's Exhibit 30 to 39, that have new remixes that weren't otherwise included on Exhibit 11?

        MR. BRAUN: Object to the form.

   A.   I believe so.

   Q.   By the way, are the dates that are reflected on allmusic's Website in connection with the releases of Exhibits 30 to 39 accurate as far as you know?

        MR. BRAUN: Object to the form.

   A.   I do not know.

   Q.   Why were -- why did DM remix again the tracks that were on Exhibit 11 for inclusion on Exhibit 31?

        MR. BRAUN: Object to the form.

   Q.   For what purpose?

        MR. BRAUN: Object to the form.

   A.   For the purpose of releasing a new release.

   Q.   When was -- do you have any knowledge

Watson

alongside as a side person, as a --

Q.    Has he ever held himself out to the public to be a reggaeton artist, as far as you know?

MR. BRAUN:  Object to the form.

A.    I don't believe so, no.

Q.    What was done to the Crunk recordings -- strike that.  The recordings that were remixed to create the recordings on "Reggaeton," the remix album, were they previously in the genre of crunk music?

MR. BRAUN:  Object to the form.

A.    The vocals, once again, we're going back to the vocal sound source, which was provided to me from Mr. Glover, are the same, except I -- except for the fact that the profanity is taken out of this release.

Q.    And you're referring to the "Reggaeton"?

A.    The "Reggaeton" release, yes, Exhibit 31.  Yes, essentially, the profanity was taken out, but the original vocal source was completely kept in its form.

Q.    And the music is different on the