Watson

Q. Do you know if these music buyers use the One Sheet to determine their own in-store promotion of the product referenced in the One Sheet?

MR. BRAUN: Object to the form.

A. I think they -- I can't really speak on behalf of what a buyer thinks or how they -- how their decision processes are towards in-store promotions.

Q. Well, do you think it would be reasonable for a music buyer to rely upon the information that was included in a One Sheet in determining how they would promote a particular product in their own store?

MR. BRAUN: Object to the form.

Q. That's a yes or a no.

MR. BRAUN: Object to the form.

Q. You can answer the question.

A. Either a yes or a no? It has to be either yes or no?

Q. Well, do you think -- the question was do you think it would be reasonable?

MR. BRAUN: Object to the form.

A. I'm not sure.

Watson

1
2  Q.  Do you think it would be unreasonable
3  for a music buyer to rely upon the information
4  included on a One Sheet?
5      MR. BRAUN:  Object to the form.
6  A.  I think that music buyers rely on past
7  sales on their computer, return rates, the speel
8  from the salesperson; they rely on information
9  about release dates and titles from the One
10 Sheet, but they don't rely totally on the One
11 Sheet, but these are highly experienced people
12 in their field.
13 Q.  Who at DM is responsible for creating
14 One Sheets?
15 A.  I am.
16 Q.  And was that true in 2002 and 2003?
17 A.  Yes, sir.
18 Q.  From your perspective, what is the
19 purpose of a One Sheet?
20 A.  Well, the One Sheet is to give buyers
21 of recorded music the time when a release is
22 available, the artist, how long the release is,
23 basic data to help them decide if they want to
24 buy the product.
25 Q.  And is it your purpose in creating a

Watson

the marketplace, did you believe TVT was a competitor of DM Records in connection with the sale of Lil' Jon recordings?

A. No.

Q. Did there come a point in time that you believed that DM Records and TVT were competitors of each other in connection with the sale of Lil' Jon recordings?

A. No.

Q. Based upon your experience in the music industry, do simultaneously released albums by the same recording artist affect the sales of each release?

MR. BRAUN: Object to the form.

A. There are so many releases per year, over 40,000, I'm probably not qualified to answer that. I would say that the market that we were going after was completely different than the market that TVT was going after.

Q. And what market were you going after?

A. Die-hard fans of early Lil' Jon's work as opposed to new fans of radio hits.

Q. How did you come to that conclusion?

MR. BRAUN: Object to the form.

Watson

Q. Who contacted whom?

A. I called Mr. Gottlieb.

Q. For what purpose?

A. I heard through some of -- some retailers, I believe, and pressing plants that Mr. Gottlieb was very upset that we released this record, so I wanted to call him and find out, you know, what he was upset about, for one, and that's basically the gist of the conversation.

Q. How long did the conversation last?

A. I specifically wrote down when I called him and how long the conversation last and I don't have that with me right now.

Q. In your notes did you write down any of the content of what you said to him and he said to you?

A. Yes. Well, not in the notes, but in -- in my memory I made a mental note.

Q. Okay. What did you say to him and what did he say to you, to the best that you recall?

A. Okay. I, when I spoke with him, I said that, you know, I've heard that you've, you

Watson

know, you're upset over this release, and I want you to know that I don't want any trouble, you know. What can I do to make you feel better about this?

And his comment was, Take it off the marketplace. Put it out later and I'll distribute it for you.

I said, I can't do that. It's already in the book. I have a distribution deal, an exclusive distribution deal with Ryko, and I can't do that. I'm sorry. What else?

He said, Change the cover. Change something on it, you know, change that it's classic Crunk, that it's an old record.

And he was very upset and abruptly ended the call, and the reason why I did call him is because I think he had an attorney write letters that were being distributed through all the retailers saying that the product was a bootleg and that we had no rights to it and that some of the same songs were on his upcoming release.

Q.   Did he tell you himself why he was upset with your release?

1   Watson

2   (Plaintiff's Exhibit 12, a DJ Smurf

3   album entitled "Dead Crunk," marked for

4   identification, as of this date.)

5   Q.   I show you what's been marked as

6   Plaintiff's Exhibit 12 and ask you if you can

7   identify that document before.

8   MR. BRAUN:   Object to the form.

9   Q.   That CD.   Excuse me.

10   MR. BRAUN:   Object to the form.

11   A.   This is a DJ Smurf record that was put

12   out through Ichiban.

13   Q.   Are you familiar with that record?

14   A.   Uh-huh.   Yes.

15   Q.   Is the -- strike that.   The third song

16   or the third track on Exhibit 12, can you

17   identify that track for us, please?

18   MR. BRAUN:   Object to the form.

19   A.   "Stop Trippin" --

20   Q.   Is that --

21   A.   -- "(Featuring Lil' Jon & The East

22   Side Boyz)."

23   Q.   Okay.   Was that composition, "Stop

24   Trippin," that's on the DJ Smurf album

25   originally released as a DJ Smurf song featuring

Watson

Lil' Jon & The East Side Boyz, Daddy T, Ludacris and Lil' Chris?

    A.    Excuse me, your question was?

        MR. BRAUN:  Object to the form.

        MR. CAPLAN:  Can you repeat the question, please?

        (Record read.)

        MR. BRAUN:  Object to the form.

    Q.    You can answer the question.

    A.    Yes, a composition was.

    Q.    With respect to the release of "Stop Trippin" on Exhibit 11, what changes or modifications were made to the prior master that was included on Exhibit 12?

        MR. BRAUN:  Object to the form.

    A.    It's the title -- it's the first song and it says "Stop Trippin (Featuring Ludacris)."

    Q.    No, I'm asking as to what modifications were made in the remixing process.

    A.    In the remixing of the master or the composition?

    Q.    The remixing of the master.

        MR. BRAUN:  Object to form.

    A.    The master.  As stated earlier, we

1  Watson
2  particular with you on the phone as to how he
3  wanted the packaging changed?
4     A.   He -- he said that it was confusing
5  and that we should -- he never -- Excuse me. He
6  never actually told me specifically what to
7  change.
8     Q.   But he told you that the packaging was
9  confusing?
10    A.   Yes, or the whole project was
11 confusing, but he did not want it in the
12 marketplace and he wanted to distribute it in
13 March.
14    Q.   Well, when he told you that the
15 packaging was confusing, did you agree or
16 disagree with that statement?
17    MR. BRAUN:  Object to the form.
18    A.   I disagreed.
19    Q.   After he told you that the packaging
20 was confusing, did you change the packaging?
21    A.   Yes.
22    Q.   And did you change the packaging after
23 one of the two litigations that we're sitting
24 here today for was commenced?
25    A.   It was prior to that.

Watson

somewhere. I have to find it. But it wasn't lengthy. It was not lengthy.

Q. More or less than five minutes?

A. Probably five minutes or so.

Q. Was anybody else on the line?

A. No.

Q. Had you had any written communications with Mr. Gottlieb prior to this phone conversation with him?

MR. BRAUN: Object to the form.

A. I don't believe so. I believe I sent him the CDs, and I might have written something on it like I Fed Ex-ed him the CDs.

Q. When did you Fed Ex him the CDs?

A. I think after I spoke with him.

Q. After you spoke with him?

A. Yeah.

Q. So he didn't have the CDs in front of him when he was talking to you on the phone, or at least he didn't lead you to believe --

A. I don't know. I don't remember that.

Q. Did he say to you on the phone that he had heard this, the release "Certified Crunk, Da Remix"?

Case 1:05-cv-05602-JGK-KNF   Document 73-2   Filed 02/05/07   Page 10 of 12

Page 303

Watson

   A.    No.

   Q.    For what purpose did you send him the CDs?

   A.    He asked for them.

   Q.    Which CDs did you send?

   A.    I believe -- well, I believe I sent him the "Certified Crunk, Da Remix" and maybe the old -- the old record.

   Q.    Exhibit 11?

   A.    Exhibit 11 and Exhibit 1. No, not Exhibit 1.

       Yes, sir, Exhibit 6, because I specifically remember putting them into a little bubble pack and my written communication is something like, "Here are the two CDs as per our phone conversation," and just put my name. It was like a very informal kind of Fed Ex at the last minute.

   Q.    And it -- do you recall whether or not you sent this Fed Ex to him before or after the phone call?

   A.    Oh, it was definitely after.

   Q.    Did you have any further oral communication with Mr. Gottlieb after you sent

1  Watson
2  him the two CDs?
3      A.    No.
4      Q.    Did you ever send him a copy of
5  Exhibit 19?
6      A.    No.
7      Q.    Did you ever tell Mr. Gottlieb that
8  you would be changing the packaging on Exhibit
9  11?
10     A.    As I testified yesterday, I believe I
11 just made my concerns as to, "What can I do to
12 resolve your disapproval?"
13     Q.    Did you tell Mr. Gottlieb on the phone
14 that you would be changing the packaging to
15 Exhibit 11?
16     A.    I -- I told him that I would do
17 whatever he wanted me to do to resolve this, and
18 he never really gave me a straight answer as to
19 what I could do to resolve it other than take it
20 off the market and let him distribute it in
21 March.
22     Q.    How did the communication with
23 Mr. Gottlieb end?
24     A.    How?  Can you be more specific?
25     Q.    What were the last few lines said

1                            Watson

2   prior week?  It's in the third paragraph.

3        A.    Okay.

4        Q.    Would that refresh your recollection
5   that you provided copies of CDs to Mr. Gottlieb
6   sometime in October of 2003?

7        A.    I believe that would be correct.

8        Q.    So it's your understanding that Mr.
9   Braun in the third paragraph is referring to the
10  two CDs that you put into an envelope and sent
11  to Mr. Gottlieb?

12       A.    It wasn't an envelope, it was a Fed Ex
13  package.  I believe that's what he's referring
14  to.

15             MR. CAPLAN:  Let's mark as Plaintiff's
16       Exhibit 55 a document bearing Bates stamp
17       number DM 0189.

18             (Plaintiff's Exhibit 55, a document
19       bearing Bates stamp number DM 0189, marked
20       for identification, as of this date.)

21       Q.    Is it your understanding that this
22  letter from Mr. Glover was in response to him
23  being provided a copy of Plaintiff's Exhibit 21?

24             MR. BRAUN:  Object to the form.

25       A.    No.