UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――

TEEVEE TOONS, INC. d/b/a TVT RECORDS,

                    Plaintiff,           05 Civ. 5602 (JGK)

         - against -               MEMORANDUM OPINION
                                    AND ORDER

DM RECORDS, INC.; REP SALES, INC. d/b/a
RYKO DISTRIBUTION PARTNERS,

                  Defendants.
―――――――――――――――――――――――――――――

JOHN G. KOELTL, District Judge:

    The plaintiff, TeeVee Toons, Inc. d/b/a TVT Records
("TVT"), a record company engaged in the business of
manufacturing, distributing, and licensing sound recordings,
brings this action for the infringement of copyrights in musical
compositions under the Copyright Act of 1976, 17 U.S.C. §§ 101
et seq. The action concerns six musical compositions written
wholly or in part by the artist Jonathan Smith p/k/a Lil Jon
("Lil Jon"). The compositions are entitled (1) Stop Trippin;
(2) Cut Up; (3) Y'all Don't Feel Me; (4) Get Crunk; (5) Bounce
Dat Ass; and (6) Who U Wit (the "Compositions"). (See Amended
Complaint ("Compl.") ¶ 7.) The plaintiff alleges that the
defendants, DM Records, Inc. and Rep Sales, Inc. d/b/a Ryko
Distribution Partners, infringed and continue to infringe the
plaintiff's interests in the copyrights by manufacturing and
distributing eleven separate albums containing what the
plaintiff characterizes as "modified uses" and the defendants

characterize as "remixes" of the Lil Jon recordings. (See Pl.'s
Statement of Material Facts on Mot. for Summ. J. Pursuant to
Local Rule 56.1 ("Pl.'s 56.1 Stmt.") ¶ 13; Defs.' Response to
Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1
("Defs.' Resp. 56.1 Stmt.") ¶13.) The plaintiff and the
defendants have each moved for summary judgment.

I.

The following facts are undisputed except where noted.
Jonathan Smith and Mirror Image d/b/a Carlos Glover ("Glover")
entered into an Exclusive Recording Artist Agreement on October
1, 1996, giving Glover the exclusive rights to release Lil Jon's
albums.  (See 1996 Exclusive Recording Artist Agreement between
Smith and Glover ("1996 Smith/Glover Agreement"), Defs.' Ex. F;
Defs.' Statement of Material Facts on Motion for Summ. J.
Pursuant to Local Rule 56.1 ("Defs.' 56.1 Stmt.") ¶ 2; Pl.'s
Response to Defs.' Statement of Material Facts Pursuant to Local
Rule 56.1 ("Pl.'s Resp. 56.1 Stmt.") ¶ 2.) In 1997, the Lil Jon
album Get Crunk: Who U Wit da Album was released, containing the
original recorded performances of the Compositions. The album
was manufactured by Glover pursuant to the 1996 Smith/Glover
Agreement (See Defs.' Ex. F) and distributed by Ichiban Records
("Ichiban") pursuant to a 1995 Distribution Agreement between
Glover and Ichiban (See 1995 Glover/Ichiban Record Distribution
Agreement ("1995 Glover/Ichiban Distribution Agreement"), Defs.'

2

Ex. E; Defs.' 56.1 Stmt. ¶ 4; Pl.'s Resp. 56.1 Stmt ¶ 4.)

On October 31, 2000, Glover and Lil Jon executed a Termination and Release Agreement. (See 2000 Smith/Glover Termination and Release Agreement ("2000 Smith/Glover Termination Agreement"), Defs.' Ex. G.) The agreement provided that Glover conveyed 100% of his rights and interests in all copyrights owned by Glover in the Compositions, but Glover retained a 50% co-publishing interest in the Compositions. (Id.; see Pl.'s 56.1 Stmt. ¶ 10; Defs.' Resp. 56.1 Stmt. ¶ 10.) The parties agreed at oral argument of the current motions that the agreement gave Glover a continuing copyright interest in the Compositions, including the right to make derivative works from the Compositions. (See Hr'g Tr. 68-71, September 6, 2007.)

Jonathan Smith transferred the exclusive ownership of all of his copyright interests in the Compositions to the plaintiff by a written agreement dated May 30, 2001. (See 2001 Smith/TVT Music Publishing Agreement ("2001 Smith/TVT Music Publishing Agreement"), Aff. of Jacqueline M. Sussman, dated November 30, 2006 ("Sussman Aff."), Ex. 3.; Pl.'s 56.1 Stmt ¶ 10; Defs.' 56.1 Stmt ¶ 10.)

On July 20, 2001 Glover executed a Record Distribution Agreement with DM Records, giving DM Records the sole and exclusive right to distribute certain recordings, including the Compositions. (See 2001 Glover/DM Record Distribution Agreement

("2001 Glover/DM Record Distribution Agreement"), Defs.' Ex. I.)
The agreement provided, among other things, that Glover had the
obligation to "[obtain] all mechanical licenses and [pay] all
mechanical license fees, [file] copyright registrations on all
Recordings subject to copyright and [obtain] all clearances with
respect to use of the services, name, or likeness of any
person." (Id. at ¶ 4(b).) The agreement provided that Glover
warranted and represented that he "shall own and control by
License, contract or otherwise the copyright in and to all
Recordings…." (Id. at 5(c).) The agreement defined "Recordings"
to include "all forms of reproductions, now or hereafter known,
manufactured or distributed providing for home use. . .
embodying sound alone. . .." (Id. at 11(b).)

On September 24, 2001, pursuant to a Bankruptcy Order from
the Bankruptcy Court of the Northern District of Georgia,
defendant DM Records acquired certain executory contracts of
Ichiban including Glover's Distribution Agreement with Ichiban.
(See Mot. and Order Granting Mot. to Assume and Assign Executory
Contracts issued by the United States Bankruptcy Ct. of the
Northern District of Georgia ("2001 Bankruptcy Order"), Defs.'
Ex. H.)

On August 15, 2003, Glover and DM Records entered into an
agreement for the co-production of newly released masters based
on the Compositions at issue in this action, among others. (See

4

2003 Glover/DM Remix Co-Production Deal Memo ("2003 Glover/DM Remix Co-Production Deal Memo"), Defs.' Ex. N.) The agreement provided that DM Records would pay Glover a share of the profits from the sale of the recordings. The agreement specified that Glover ("Participant") agrees "to assign and transfer to DM an undivided one-half (1/2) interest of Participant's right, title and interest in all newly created master recordings made for this Album." (Id. at ¶ 5.)

Commencing on or around November 2003, defendant DM Records manufactured eleven albums that embodied one or more uses of the Composition at issue: (1) 281 Boyz: Chopped and Screwed 2003, which embodies a sound recording based upon the composition "Stop Trippin"; (2) Lil Jon & the East Side Boyz, Certified Crunk ("Certified Crunk"), which embodies sound recordings based upon the compositions "Stop Trippin'", "Cut Up", "Y'all Don't Feel Me", "Get Crunk", "Bounce Dat Ass", and "Who U Wit", and a sound recording entitled "Lil Jon Megamix" based upon each of the Compositions; (3) Crunk da Mix Tape which embodies sound recordings based upon the compositions "Stop Trippin", "Get Crunk", "Bounce Dat Ass", "Cut Up", and "Y'all Don't Feel Me Yet", and a sound recording entitled "Lil Jon Megamix" based upon each of the Compositions; (4) Dead Crunk 2004 which embodies a sound recording based upon the composition "Stop Trippin"; (5) Get Crunk 305 Remix which embodies sound

5

recordings based upon the composition "Get Crunk"; (6) <u>Bootleg Crunk</u> which embodies sound recordings based on the compositions "Stop Trippin" and "Get Crunk"; (7) <u>Club Crunk</u> which embodies sound recordings based on the composition "Bounce Dat Ass" and "Y'all Don't Feel Me Yet"; (8) <u>Old School Crunk Mix</u> which embodies a sound recording entitled "Lil Jon Megamix" based upon each of the Compositions; (9) <u>Crunk da Mix Tape 2</u> which embodies sound recordings based upon the compositions "Stop Trippin" and "Get Crunk"; (10) <u>Crunk Wars</u> which embodies sound recordings based upon the compositions "Stop Trippin" and "Get Crunk"; and (11) an album entitled <u>Reggaetown Remix</u> which embodies sound recordings based upon the compositions "Stop Trippin", "Get Crunk", "Cut Up", "Y'all Don't Feel Me", and "Bounce Dat Ass", and a sound recording entitled "Lil Jon Megamix", based upon each of the Compositions. (See Pls.'s 56.1 Stmt ¶ 13; Defs.' Resp. 56.1 Stmt ¶ 13.) The defendant Rep Sales distributed each of the albums pursuant to an agreement with DM Records dated November 1, 1999. (<u>See</u> Declaration of Brian P. Caplan, dated November 30, 2006 ("Caplan Decl."), Ex. 3; Pl.'s 56.1 Stmt ¶ 15; Defs.' Resp. 56.1 Stmt ¶ 15.)

In October 2003, DM Records filed a Copyright Registration with the United States Copyright Office for the <u>Certified Crunk</u> album, specifying that the album contained derivative works of the Compositions. (<u>See</u> Caplan Decl., Ex. 12.) The registration

relied on the written agreements with Glover from July 2001 and
August 2003.  Also in October 2003, DM Records filed Notices of
Intention to Obtain Compulsory Licenses for Making and
Distributing Phonorecords ("Notices of Intention") with the
United States Copyright Office for each of the Compositions,
specifying in each Notice that the song was to be included on
the compact disc entitled <u>Certified Crunk</u> featuring the artist
Lil Jon and the Eastside Boyz, for distribution in November
2003. (<u>See</u> Caplan Decl., Ex. 14.)  DM Records filed additional
Notices of Intention on June 21, 2005, seeking a compulsory
license for the use of the Compositions for publication on the
compact disc entitled <u>Reggaetown Remix</u>, featuring Lil Jon and
the Eastside Boyz, to be released on August 16, 2005. (<u>See</u> <u>id.</u>)

   In April 2005, Glover and TVT executed a written agreement
purporting to assign and transfer to TVT the sole, exclusive and
unrestricted right to administer and exploit Glover's copyright
interests in the Compositions and other works.  (<u>See</u> April 2005
TVT/Glover Recording Agreement ("2005 TVT/Glover Agreement")
Sussman Aff., Ex. 4.)

   On June 8, 2005, the defendant DM Records sent a letter to
TVT attaching the Notices of Intention to Obtain Compulsory
Licenses and enclosing a voluntary license for the Compositions.
The letter explained that while the compulsory license
accommodates the needs of DM Records, the voluntary license was

in the best interest of all parties, providing "more administratively efficient terms," including "quarterly accounting and direct payment and accounting to the co-publishers of the Compositions." (See Caplan Decl., Ex. 14.) TVT declined to sign the attached voluntary mechanical licenses. (See id.) TVT filed this action for copyright infringement on December 13, 2005. (See Compl.)

**II.**

**A.**

The plaintiff and the defendants have filed cross-motions for summary judgment on the copyright infringement claims. The standards to be applied to a motion for summary judgment are well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-

finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must produce

evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

**B.**

To establish a claim of copyright infringement a plaintiff must prove that "(1) the plaintiff had a valid copyright in the work allegedly infringed and (2) the defendant infringed the plaintiff's copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir. 2005) (internal quotation marks omitted).

The plaintiff moves for summary judgment as to liability on the copyright infringement claims. The plaintiff contends that there are no genuine issues of material fact as to the plaintiff's copyright interest in the Compositions either from Smith based on the 2001 Smith/TVT Music Publishing Agreement or from Glover based on the April 2005 TVT/Glover Recording Agreement. The plaintiff also contends that there is no material issue of fact that the defendants infringed the plaintiff's copyright interest in the Compositions because of the defendants' alleged unauthorized manufacture and distribution of derivative works from the Compositions.

10

The defendants move for summary judgment claiming that the plaintiff had no valid copyright interest in the Compositions, and they challenge whether the plaintiff obtained a valid copyright interest from either Smith or Glover. The defendants also contend that they did not infringe any copyright the plaintiff had because DM Records had the right to produce the albums on the basis of the 2001 Glover/DM Record Distribution Agreement and 2003 Glover/DM Remix Co-Production Deal Memo and through Glover's participation in making the remixes. In the alternative, the defendants claim that the remixes were not infringing works because they were authorized pursuant to the compulsory licenses DM Records obtained.

### III.

The first element of a valid copyright infringement claim is the requirement that the plaintiff has a valid copyright interest in the work allegedly infringed. See Island Software & Computer Serv., Inc., 413 F.3d at 260. Copyright ownership initially vests in the author or co-authors of a work, and may be transferred in whole or in part. 17 U.S.C. § 201(a), (d). The copyright owner has certain exclusive rights including the right to reproduce the copyrighted work and to prepare derivative works based on the copyrighted work. 17 U.S.C. § 106(1),(2). The owner of any of the exclusive rights comprised in a copyright is entitled, to the extent of that right, to all of the protections

11

and remedies accorded to the copyright owner. 17 U.S.C. §
201(d)(2). A transfer of copyright ownership is not valid unless
an instrument of conveyance is in writing and signed by the
owner of the rights conveyed or the owner's agent. 17 U.S.C. §
204(a).

**A.**

The plaintiff claims that there is no genuine issue of
material fact that it has succeeded to Smith's interest as an
author of the Compositions because Smith assigned his copyright
interest in the Compositions to the plaintiff in the 2001
Smith/TVT Music Publishing Agreement.

The plaintiff obtained Copyright Registration Certificates
issued by the United States Copyright Office, which list
Jonathan Smith as an author of each of the Compositions, and the
plaintiff as the copyright claimant as a result of assignment.
(See TVT Copyright Registration Certificates, Sussman Aff., Ex.
5.) A copyright registration certificate made before or within
five years after the first publication of a work constitutes
prima facie evidence of the validity of the copyright and the
facts stated in the certificate. 17 U.S.C. § 410(c). Because
TVT's registration certificates were filed over five years after
the first publication of the works, this Court has discretion
over how much evidentiary weight to give to the registration
certificates. See Telerate Sys., Inc v. Caro, 689 F. Supp. 221,

12

227 (S.D.N.Y. 1988).

The defendants challenge the legitimacy of the plaintiff's chain of title and argue that the TVT Copyright Registration Certificates are not entitled to be viewed as prima facie evidence. They assert first that the plaintiff has produced no evidence that Lil Jon was the indisputable author of the works, and second they argue that TVT's chain of ownership is invalid. (See Defs.' Opp. Memo. of Law at 5-6.) The plaintiff has produced evidence that is not subject to dispute that it holds a copyright interest in the Compositions because of the assignment from Smith.

The defendants have not produced any evidence from which a reasonable juror could conclude that the plaintiff is not the valid copyright holder of the Compositions. First, although the Court has discretion as to how much evidentiary weight to give the Copyright Registration Certificates, the defendants do not present any reasonable basis to challenge the reliability of the Copyright Registration Certificates. While the defendants question whether Smith was really the author of the Compositions, there is no basis for that challenge. Beyond the Copyright Registration Certificates which list Jonathan Smith as the author (See TVT Copyright Registration Certificates, Sussman Aff., Ex. 5), the compact discs containing the original compositions identify Lil Jon as the author (See Caplan Decl.

Ex. 4a), and the plaintiff produced agreements signed by Jonathan Smith transferring and assigning his interests in the Compositions (See Sussman Aff. Exs. 1-3). Furthermore, DM Records identified Lil Jon as the author of the Compositions on its Notices of Intention to Obtain Compulsory Licenses (See Caplan Decl., Ex. 14) as well as on the packaging and liner notes of the albums in question (See Caplan Decl., Ex. 6(a)). There is no basis to consider the plaintiff's Registration Certificates to be unreliable. See Telerate, 689 F. Supp. At 227.

The defendants also fail to produce evidence that creates a genuine issue of material fact as to the legitimacy of the plaintiff's chain of title from Smith. The plaintiff claims a valid chain of title on the basis of several undisputed written agreements: first, the 1996 Smith/Glover Agreement dated October 1, 1996, by which Jonathan Smith transferred an undivided 50% interest in his copyright interests in the Compositions, and the exclusive rights to administer and exploit the Compositions to Carlos Glover (Defs.' Ex. F); second, the 2000 Smith/Glover Termination Agreement dated October 31, 2000, whereby Smith and Glover agreed to terminate the 1996 Smith/Glover Agreement, with Glover assigning and transferring his undivided interests in the copyrights in the Compositions to Smith, with Glover retaining a 50% co-publishing interest in the Compositions (Defs.' Ex. G);

14

and third, the 2001 Smith/TVT Music Publishing Agreement dated
May 20, 2001, whereby Smith transferred and assigned to the
plaintiff exclusive ownership of all of Smith's copyright
interests in the Compositions (Sussman Aff., Ex. 3).

The defendants contend that Glover had no authority to
enter into the 2000 Smith/Glover Termination Agreement because
the 1995 Glover/Ichiban Distribution Agreement was an executory
contract that had been acquired by DM Records in the Ichiban
bankruptcy proceeding and that the Smith/Glover Termination
Agreement affected the Glover/Ichiban Distribution Agreement and
had to be approved by the bankruptcy court.  This argument has
no apparent merit and the defendants cite no legal authority to
support it.  The 2000 Smith/Glover Termination Agreement
pertained to the 1996 Smith/Glover Agreement (See 2000
Smith/Glover Termination Agreement, Defs.' Ex. G). The
defendants do not explain why the existence of a bankruptcy for
Ichiban, in which Glover was not the debtor, affected the
ability of Glover to assign, transfer, or terminate any rights
that he had in the 1996 Smith/Glover Agreement.  Therefore the
plaintiff has established a valid copyright interest in the
Compositions based on the assignment of Smith's interest.

**B.**

The plaintiff also contends that it had a valid copyright
interest in the Compositions based on the 2005 TVT/Glover

15

Agreement dated April 2005 between TVT and Glover whereby Glover
assigned and transferred to the plaintiff the right to
administer and exploit Glover's copyright interests in the
Compositions.  (Sussman Aff., Ex. 4.) The defendants in turn
claim that the 2005 TVT/Glover Agreement was void because it
violated the rights Glover had previously given to DM Records in
the 2001 Glover/DM Record Distribution Agreement (Defs.' Ex. I)
and the 2003 Glover/DM Remix Co-Production Deal Memo (Defs.' Ex.
N). The defendants claim that in any event their documents gave
DM Records the right to manufacture and distribute the allegedly
infringing albums containing the Compositions.

Under New York law, "the initial interpretation of a
contract 'is a matter of law for the court to decide.' " K. Bell
& Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d
Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d
295, 299 (2d Cir. 1996)); see also Curry Rd. Ltd. v. K Mart
Corp., 893 F.2d 509, 511 (2d Cir. 1990) ("Whether a contract
term is ambiguous is a question of law."). A court should
construe a contract as a matter of law only if the contract is
unambiguous on its face. See Metro. Life Ins. Co. v. RJR Nabisco
Inc., 906 F.2d 884, 889 (2d Cir. 1990). A contract is
unambiguous if it "has 'a definite and precise meaning,
unattended by danger of misconception in the purport of the
[contract] itself, and concerning which there is no reasonable

16

basis for a difference of opinion.' " Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir.1993) (alteration in original) (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)); see also United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 109 (2d Cir.1993); Metro. Life Ins. Co., 906 F.2d at 889. Where the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact.[1] Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); See Payday Advance Plus, Inc. v. Findwhat.com, Inc., 478 F.Supp.2d 496, 502 (S.D.N.Y. 2007); Abner, Herrman & Brock, Inc. v. Great N. Ins. Co., 308 F.Supp.2d 331, 336 (S.D.N.Y. 2004).

The parties agree that, as a result of the 2000 Smith/Glover Termination Agreement, Glover retained a copyright interest in the Compositions including the right to make derivative works from the Compositions. In 2003, when the

---

[1] The parties have not briefed the issue of the proper law to be applied to the contracts. The 2001 Glover/DM Record Distribution Agreement contained a Georgia choice of law provision. Glover resided in Georgia and DM Records was located in Florida. The 2003 Glover/DM Remix Co-Production Deal Memo contained no choice of law provision. None of the parties has attempted to assert that Georgia or Florida law differs from the law of New York. Where there is no conflict between the law of New York and another jurisdiction, the court may dispense with the choice-of-law analysis and apply New York law. See, e.g., Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing J. Aron & Co. v. Chown, 647 N.Y.S.2d 8, 8 (App. Div. 1996)); Berwick v. New World Network Intern., Ltd., No. 06-Civ-2641, 2007 WL 949767, at *6 (S.D.N.Y. 2007). Therefore, the Court applies New York law to the contracts.

remixes were created, Glover and TVT were joint owners of the copyright to the musical Compositions. If Glover conveyed ownership of the underlying copyrights to DM Records through a written agreement, they would have become joint owners as well. Joint owners may not sue each other for infringement of a work, because each owner has an undivided ownership in the work, and an individual cannot infringe his own copyright. See Weissmann v. Freeman, 868 F.2d 1313, 1317-18 (2d Cir. 1989); Davis v. Blige, 419 F. Supp. 2d 493, 500 (S.D.N.Y. 2005) (joint owner of a copyright may not sue other owners or their licensees).

The parties dispute whether Glover conveyed a copyright interest in the underlying compositions to DM Records in the 2001 Glover/DM Record Distribution Agreement. The plaintiff contends that the agreement only gave DM Records the right to distribute records that DM Records produced and did not convey any rights to the underlying Compositions, and particularly not the right to make derivative works.

On its face, the agreement is solely a record distribution agreement, and does not specifically convey any right to DM Records to make derivative works.  On the other hand, the agreement is an exclusive distribution agreement with a worldwide territory; it requires Glover to obtain any necessary licenses and copyright registrations for the covered recordings; and it defines recordings broadly and includes reproductions

18

made in the future.  The plaintiff contends that the agreement
did not provide DM Records the right to make any derivative
works from the Compositions in the future without obtaining a
separate license for that use in the future.  However, the
agreement is not so unambiguous that the Court could decide as a
matter of law whether it required Glover to distribute future
derivative works from the Compositions through DM Records and
undertook to convey any necessary licenses to do that.

     The defendants also rely on the 2003 Glover/DM Remix Co-
Production Deal Memo. (Defs.' Ex. N.) They contend that they
obtained the right to manufacture and distribute the allegedly
infringing albums pursuant to that agreement.  The plaintiff
contends that the agreement never conveyed to DM Records a
copyright interest in the underlying Compositions. The 2003
Glover/DM Remix Co-Production Deal Memo was a preliminary
agreement that did not specifically deal with the issue of
conveying the copyright interest in the Compositions.  The 2003
Glover/DM Remix Co-Production Deal Memo did provide that Glover
would transfer to DM Records one-half (1/2) interest of Glover's
right in all newly created "master recordings" which were to be
made from the "new remixes."  DM Records contends that this was
a conveyance of an interest in the copyrights in the underlying
Compositions because Glover had the ability to convey such an
interest and the agreement would make no sense without that

conveyance.

TVT, on the other hand, argues that there is a difference between an interest in the master-recording and an interest in the underlying Compositions. TVT relies on the fact that there are separate copyright elements: rights to the material object on which the sound is recorded and rights to the underlying musical composition. See 1 Melville B. Nimmer & David Nimmer, 6 Nimmer on Copyright § 30.03 (2003)("Copyright ownership of the physical embodiment of the performance of a musical composition (e.g., a master recording) is distinct from the ownership of the copyright in the musical composition itself")(cited in Ulloa v. Universal Music & Video Distribution Corp., 303 F. Supp. 2d 409, 412 (S.D.N.Y. 2004)).

TVT points out that DM Records and Glover contemplated a long-form agreement and indeed the 2003 Glover/DM Remix Co-Production Deal Memo specifically referred to such an agreement. The long-form agreement would have provided specifically for Glover to transfer to DM Records 50% of his interest in the copyrights in the Compositions. (See 2003 Exclusive Manufacturing, Marketing and Distribution Agreement ("2003 Long-Form Agreement"), Defs.' Ex. DD at 10(b).) Glover never signed the Long-Form Agreement and the terms of the 2003 Glover/DM Remix Co-Production Deal Memo are not so unambiguous that the Court could conclude that it conveyed an interest in the

copyrights in the underlying Compositions. Moreover, the Notices of Intention to Obtain Compulsory Licenses submitted to the Copyright Office in October 2003 by DM Records and the license requests to the plaintiff in 2005 lend some support to the plaintiff's contention that DM Records knew that it had not obtained ownership interests in the copyrights for the Compositions through the 2003 Glover/DM Remix Co-Production Deal Memo. (See Caplan Dec., Ex. 14.)  While the defendants claim that DM Records sought the compulsory licenses "out of an abundance of caution" in order to avoid any infringement claim, issues of fact remain as to the interpretation of the 2003 Glover/DM Remix Co-Production Deal Memo. Thus, there are genuine issues of material fact as to whether Glover, who had the right to make derivative works from the Compositions, authorized DM Records to do so.  Therefore, there are issues of material fact as to whether the defendants infringed the plaintiff's copyrights.

### C.

Finally, the defendants argue that even if DM Records did not have the right to make derivative works from the Compositions, DM Records obtained valid compulsory licenses, and therefore no infringement occurred.

The owner of a copyright may exercise or authorize others to exercise certain exclusive rights: "(1) to reproduce the

copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106.  Violating any of these rights constitutes infringement.  See 17 U.S.C. § 501.  However, Section 115 of the Copyright Act makes a "compulsory" statutory license available, which allows any person to obtain a compulsory license to make and distribute phonorecords of a nondramatic musical work after it has been released to the public.  "A compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved" as long as the arrangement does not "change the basic melody or fundamental character of the work." Derivative works are excluded.  17 U.S.C. § 115(a)(2).

The Copyright Act defines a derivative work as

[A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted.  A work consisting of editorial revisions, annotations, elaborations, or other modification, which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

The defendants contend that the remixes do not constitute

derivative works.  They rely on the testimony of their expert,
Elizabeth Marlowe, for the proposition that the tracks embodied
on the eleven albums do not change the fundamental character of
the work enough to be derivative works. (See Expert Report of
Elizabeth Marlow, Defs.' Ex. XX.)  Ms. Marlowe testified that
the remixes did not change the basic melody or fundamental
character of the underlying works. (See id.)

The plaintiff counters this claim with the testimony of its
own expert, Dr. Lawrence Ferrera, and argues that the
Compositions have been substantially recast, transformed and
adapted as they appear on the allegedly infringing albums and
that they are thus derivative works. (See Caplan Decl. Ex. 10.)

At the very least, the existence of the undisputed changes
in the remixes and the varying interpretations of the
significance of those changes raises issues of fact that cannot
be decided on this motion for summary judgment. See Diplomatic
Man, Inc. v. Brown, No. 05-Civ-9069, 2006 WL 2434933, at *3-4
(S.D.N.Y. August 22, 2006) (declining to explore on a summary
judgment motion whether a "remix" was an unauthorized derivative
work and finding the terms of the contract sufficiently
ambiguous as to be a question of fact). Because there are issues
of material fact as to whether the remixes are derivative works
and therefore not subject to compulsory licenses, the defendants
are not entitled to summary judgment based on their claim that

the allegedly infringing albums qualified for compulsory
licenses.

Moreover, even if the allegedly infringing albums were
subject to compulsory licenses and are not derivative works, the
defendants could claim the protection of a compulsory license
for only one of the allegedly infringing albums, namely
Certified Crunk. The compulsory license provision requires any
person who wishes to obtain a compulsory license to serve the
license on the copyright owner, or if unknown, to file a Notice
of Intention in the Copyright Office before distributing the
phonorecords of the work. 17 U.S.C. 115(b)(1). Failure to do so:
"forecloses the possibility of a compulsory license and, in the
absence of a negotiated license, renders the making and
distribution of phonorecords actionable as acts of infringement
under section 501. . . ." 17 U.S.C. 115(b)(2).

It is undisputed that DM Records timely filed proper
Notices of Intention in the Copyright Office for the album
Certified Crunk. (See Caplan Decl. ¶ 17 and Ex. 14.) However,
it is also undisputed that DM Records failed to file any
additional Notices of Intention with respect to the remaining
albums until June 2005, after the albums were distributed. (See
Caplan Decl., Ex. 14.)

The defendants' argument that there was no need to file
Notices of Intention for the same songs embodied on subsequent

24

albums is unavailing. The regulations enacted by the Copyright
Office require Notices of Intention to identify specific
categories of information with respect to each release,
including the catalog number and label name or names to be used
on the phonorecords. See 37 C.F.R. § 201.18 (d)(v)(D),(F),(G).
The defendants clearly specified in their valid Notices of
Intention that the Compositions were to be used on the Certified
Crunk Album. (See Caplan Decl., Ex. 14.) Another route for the
defendants would have been to negotiate a license with the valid
copyright holder, TVT, to use the Compositions. See 17 U.S.C.
115(b)(2).  The defendants failed to file timely Notices of
Intention or to negotiate a license with TVT. Therefore the
compulsory license provision could only possibly authorize the
Certified Crunk album.

## CONCLUSION

The Court has carefully considered all of the parties'
arguments and, to the extent not fully addressed above, finds
them to be either moot or without merit.

For all of the reasons discussed above, the motions for
summary judgment by the plaintiff (Docket No. 52) and by the
defendants (Docket No. 48) are **denied.**

SO ORDERED.

Dated:  New York, New York
        September 27, 2007

John G. Koeltl
United States District Judge

25